IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FREDERICK MCDONALD,       )
                         )
         Plaintiff,        )
                         )
v.                        )      Case No. 5:12-cv-3592-TMP
                         )
TOBY THOMAS,          )
                         )
        Defendant.      )

## MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed on June 30, 2014, by the defendant, Toby Thomas. (Doc. 57). Defendant seeks dismissal of all of plaintiff's claims based on qualified immunity and state-agent immunity. This matter has been fully briefed.[1] The court has considered the pleadings, evidence, and the arguments set forth by both parties. The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).

---

[1] The defendant filed a reply brief, accompanied by a motion for leave to file. (Doc. 63). The motion hereby is GRANTED. Plaintiff, in response, filed a motion to strike the reply and the two affidavits attached to it, asserting that they were filed out of time and that the evidence was filed in violation of the court's scheduling order. (Doc. 65). The motion to strike is DENIED in part, in that the reply brief and affidavits will be considered, but GRANTED to the extent that the affidavits will be considered only as offered to rebut plaintiff's response, and not as substantive evidence to support the motion.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting former Fed. R. Civ. P.

56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  <u>Celotex</u>, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Id.</u> at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify which facts are material and which are irrelevant.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u> at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Id.</u> at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Id.</u> at 251-52; <u>see also</u> <u>Bill Johnson's Restaurants, Inc. v. N.L.R.B.</u>,

461 U.S. 731, 745 n.11 (1983).   However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).   If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.   Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).   Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.   Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).   Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.   Anderson, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.   Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**FACTS**

Plaintiff Frederick McDonald brought this action seeking declaratory relief, compensatory and punitive damages, and attorneys fees pursuant to 42 U.S.C. § 1983 and Alabama state law, contending that the defendant used excessive force in subduing him after a verbal altercation.   Applying above-referenced standards to the evidence in the record, the following facts appear to be undisputed, or, if disputed, are viewed in the light most favorable to the non-moving plaintiff.

McDonald's claims arise from an incident that occurred while he was serving a term of imprisonment at the Limestone Correctional Facility in Harvest, Alabama. According to the complaint commencing this action, McDonald was an inmate at the Limestone prison on July 1, 2012.   McDonald was being housed in the "G-Dorm," which was a large bunkhouse with approximately 250 inmates who are involved in a substance abuse program offered by the prison.   The main living area was not air-conditioned, and July 1, 2012, was an extremely hot day.   Adjoining classrooms and TV rooms were air-conditioned.   The G-Dorm was being supervised that day by only one officer, defendant Toby Thomas.   (McDonald Depo., Doc. 57-2, p. 7).

McDonald saw that Thomas was in one of the air-conditioned rooms to the side of the dorm, not in the central guard area, and that Thomas could not see the inmates or the dorm.   (Doc. 57-2, p. 7).   The inmates were in line to receive ice,

5

which was handed out in response to the hot weather.   McDonald was near the back of the line and was loud and complaining, while Thomas was sitting in the air-conditioned room.   McDonald had been in line earlier without a shirt on, and Thomas had ordered McDonald to go put on a shirt and had called him a "bitch." McDonald left the line to put on his shirt, but returned to the line with the shirt unbuttoned, upsetting Thomas, who cursed at McDonald again.   (Ford Affi., doc. 61-3, && 3-4; Hicks Affi., doc. 61-2, & 5).   As he stood in line McDonald was irritated because Thomas had taken a large portion of the ice into the office and had instructed the senior inmates to hand out only half a scoop to each inmate instead of a full scoop of ice.   McDonald was saying "I feel like my life in danger because you're not supervising the dorm."   (Doc. 57-2, pp. 8-9).[2]   Thomas became upset and concerned that McDonald was creating a disturbance among the inmates, and he told McDonald to pack up his belongings and go the shift commander's office. (Doc. 57-2, pp. 8-9).   McDonald testified that Thomas said to him: "If you feel like your life [is] in danger you pack your shit and get the fuck out of this dorm." (Doc. 57-2, pp. 8-9).   McDonald didn't move at that time, because he said he didn't

---

[2]   Defendant Thomas testified that McDonald had been talking belligerently to him while in line and that Thomas politely asked him "maybe two or three times to cease behavior" and "basically please stop."   (Thomas Depo., Doc. 57-3, p. 12).   He then told McDonald to go to his bunk and get his belongings but that McDonald was "meandering."   (Id. at p. 13).

feel like his life was in danger, but after Thomas kept looking at him, McDonald said, "You for real?"   (Doc. 57-2, pp. 8-9).   Thomas answered: "Hell, yeah, I'm for real.   Go get your shit and get the fuck out this dorm."   (Id.)   At that point, McDonald went to his bunk.   (Id.)

At his bunk, McDonald bent over to get some of his belongs from under the bottom bunk.  (Doc. 57-2, at p. 10).   In the meantime, Thomas had retrieved a metal baton from the guard room.   A fellow inmate saw McDonald bending down to get his things, and Thomas walked quickly towards McDonald's bunk, cursing at McDonald, with an angry expression on his face.   (Jones Affi., doc. 61-1, ¶ 3-4). McDonald saw Thomas approaching him with his baton, and asked: "What is the purpose of the stick?"   (Doc. 57-2, p. 10).   Thomas cursed at him, and McDonald cursed back at him.   (Id.)   McDonald returned to packing his belongings, and Thomas rushed up to the bunk and hit McDonald in the back of the head with his baton, using a two-hand, overhead stroke.   (Doc. 57-2, pp. 10-11).     Inmate witnesses have stated that McDonald was not acting in a physically threatening or physically aggressive manner when Thomas struck him.   (Sloan Affi.,   doc. 61-4, ¶ 6).   Thomas raised his baton with both hands and hit McDonald with an overhead strike, which sounded like a loud crack.   (Jones Affi., doc. 61-1, ¶ 5).   Thomas continued to hit McDonald with his baton four more times, on the shoulder, side,

shin and feet. (Doc. 57-2, pp. 10-11).[3] Another inmate described the blow to McDonald's head as one from the baton "held high over [Thomas's] head, and said Thomas "kept hitting [McDonald] after he was knocked down." (Hicks Affi., Doc. 61-2, ¶ 8). Another inmate described the blow to the head similarly, noting that Thomas hit McDonald from behind while McDonald was bent down collecting his belongings. (Ford Affi., Doc. 61-3, ¶¶ 6-7). McDonald did not move toward Thomas, but was "bent over at his bed when Officer Thomas came up to him from behind and hit him." (Ford Affi., doc. 61-3, ¶ 7). Inmate Jack Hershiser's statement, taken in connection with the incident, recounted that "before the guy [McDonald] could straighten up Officer Thomas hit him with the stick 2-3 times." (Doc. 61-5, p. 22). The statement of Shannon Williams stated that Thomas "continued to hit him while he was down until inmates started to yell stop beating him." (Doc. 61-5, p. 23). Thomas said he did not hit McDonald for being slow, but "for spooking me". (Thomas Depo., Doc. 57-3, p. 93).[4]

---

[3] Thomas does not dispute that the blow to McDonald's head was an overhead blow, but says he had no choice because of the proximity to the bunks.

[4] Thomas essentially asserts that McDonald was inciting a riot, or urging other inmates to create a disturbance, but this assertion is at odds with every inmate's account of the events. The only testimony that McDonald made any type of aggressive move is that Thomas said McDonald "kind of comes toward me" when he asked about the baton, and that "it kind of spooked me." (Doc. 57-3, p. 13).

After hitting McDonald, Thomas called for back-up.   (Jones Affi., doc. 61-1, ¶ 8; Ford Affi., doc. 61-3, ¶ 8; Sloan Affi., doc. 61-4, ¶ 7).[5]   Inmates Shannon White and Mike Alexander intervened by physically holding back Thomas to make him stop, and other inmates yelled at Thomas to stop.   (Doc. 57-2, p. 11, doc. 61-4, ¶ 7).   The inmates then helped McDonald off the floor, and several corrections officers arrived in the dorm.   (Doc. 57-2 at p. 11).   The officers circled Thomas to protect him from other inmates.   McDonald was taken to the health care unit where he was treated for a two- inch cut to his head and a two-inch cut to his shin.   (Doc. 57-2, p. 11; Incident Report, Doc. 61-5).   He also suffered from dizziness, blurred vision, bruising and swelling.   He says that his head wound has caused severe, continuing headaches.   (Id. at p. 12).

The Alabama Department of Corrections conducted a use-of-force investigation into the incident.   The conclusion of the captain investigating the incident was that "this use of force was not necessary."   (Doc. 61-5, pp. 28-29).[6]

---

[5]   Thomas testified that he called for backup before he got his baton.   (Doc. 57-3, pp. 13, 88).   When questioned further, however, he said he was "a little fuzzy" as to when he called for assistance.   (Id. at 24).

[6]   The Alabama Department of Corrections has in place rules concerning the use of force, which will not be set forth herein because the document has been filed under seal and is subject to a protective order.   (Plaintiff's Ex. 8, filed August 7, 2014).   Viewing the facts in the light most favorable to the inmate plaintiff, the use of physical force applied by Thomas did not fall under one of the categories in which such force would be appropriate under the ADOC guidelines.

He further concluded that "[r]ather than wait for backup, Officer Thomas followed Inmate McDonald to the bed area where this incident continued to escalate from a verbal altercation to an excessive application of force."   Id.[7]

The defendant argues that the claims brought against Thomas, who is being sued in his individual capacity, are due to be dismissed because he is entitled to qualified immunity on the federal claim and to state-agent immunity on the state-law claim.

## DISCUSSION

### A.   § 1983 Claim and Qualified Immunity

Plaintiff's claim for excessive use of force arises under 42 U.S.C. § 1983, which provides a right of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" when the deprivation is caused by anyone acting under color of law.   Id.   Essentially, plaintiff asserts that he was unlawfully beaten by a corrections officer after the verbal altercation that occurred on July 1, 2010.

---

[7]   In his brief, plaintiff asserts that disciplinary action was taken against Thomas for excessive use of force and that Thomas did not appeal the disciplinary action.  The deposition testimony cited in support of that assertion, however, was not included in the excerpts provided to the court.

Under federal law, it is well settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights." Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).  The shield of qualified immunity has been expanded to include acts that may not involve the exercise of "actual discretion," and can include acts that may be ministerial but are "job-related functions" and are through means that are within the official's authority to utilize.  Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004), quoting Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1185 n. 17 (11th Cir. 1994).  Furthermore, it is the general rule that qualified immunity will protect government actors from liability, and only in "exceptional cases" will the immunity be unavailable as a shield.  Harris v. Board of Education of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997).  Even so, qualified immunity does not apply in those instances where the case law establishes a "bright line" in such a "concrete and factually defined context" to make it obvious to all reasonable government actors, in the defendant's place, that the actions violate federal law.  Scarbrough v. Myles, 245 F.3d 1299, 1301 (11th Cir. 2001).

The initial burden of demonstrating that the public official is acting within the scope of his position lies with the defendant asserting that defense.   Holloman, 370 F.3d at 1265-66.   The test is not whether the defendant had the authority to effectuate an illegal act, but whether his job entailed engaging in the act in general. See id.   In other words, the court does not ask whether the defendant had the right to use excessive force against the plaintiff, but simply whether disciplining or controlling an inmate was within the general scope of the officer's duties.   The defendant has met the burden of demonstrating that his duties as a corrections officer included maintaining control over the inmates.

Once the defendant has met that burden, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity.   Id.   To prevail against an assertion of qualified immunity, the plaintiff must demonstrate that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."   Id. at 1264, citing Wilson v. Layne, 526 U.S. 603, 609, 199 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999).

The plaintiff's right to be free from the use of excessive force as an inmate derives from the Eighth Amendment prohibition against cruel and unusual

punishment.[8]   Whitley v. Albers, 475 U.S. 312, 318, 106 S. Ct. 1078, 1083, 89 L. Ed. 2d 251 (1986).   The standard for assessing whether an inmate's constitutional rights have been violated is essentially the same under both the Eighth Amendment and the Due Process Clause.   See, e.g., Williams v. Burton, 943 F.2d 1572 (11th Cir. 1991), cert. denied, 505 U.S. 1208 (1992).   In both instances, the courts must "show great latitude to the discretion of prison officials in inmate management." Williams, 943 F.2d at 1576, citing Bell v. Wolfish, 441 U.S. at 54; see also   Hamm v. DeKalb County, 774 F.2d 1567, 1572 (11th Cir. 1985), cert. denied, 475 U.S. 1096 (1986).   The Eleventh Circuit Court of Appeals has described the court's role in these cases as one that gives a "wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." Fennell v Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009), quoting Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (internal quotation marks, alterations, and citation omitted).

---

[8]   Plaintiff's claim that he is entitled to relief under the Fifth and Fourteenth Amendments, which applies only to the federal government and not to state or local governments, is without merit.   See, e.g., Perry v. Sinderman, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972).   The Supreme Court has made clear that the proper analytical framework for claims by prison inmates of excessive force by prison guards is the Eighth Amendment, not the Fifth or Fourteenth Amendment due process clauses.

In the context of an Eighth Amendment claim, an inmate is entitled to be free from the "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084, 89 L. Ed. 2d 251 (1986). The United States Supreme Court has held that the "core judicial inquiry" in an Eighth context is whether the force applied was the result of a "good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 112 S. Ct. 995, 117 L. Ed. 2d 156, 165-66 (1992). An Eighth Amendment excessive force claim involves "both a subjective and objective component," in which the court looks to both the state actor's state of mind, and the objective harm that resulted from the application of force. Johnson v. Moody, 206 Fed. App'x 880, 883 (11th Cir. 2006), citing Hudson, 503 U.S. at 8.

The court in Hudson recognized the need for prison guards to keep order and maintain discipline through force, and set out factors which should be considered in evaluating whether a use of force was malicious and sadistic: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the threat reasonably perceived by the prison official; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate. Hudson, 117 L. Ed. 2d at 166. Moreover, the Eleventh Circuit Court of Appeals recently has noted that any infliction of excessive force that is

14

"sadistic and malicious" by its very nature precludes application of qualified immunity because it involves the subjective state of mind of the defendant officer. Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002).    By contrast, inflicting injury "by accident," or even intentionally when the resulting injury is very minor, may be deemed not "objectively sufficiently serious" to support an excessive force claim against a prison official.  See Johnson v. Moody, 206 Fed. App'x 880, 886 (11th Cir. 2006) (inmate's superficial injury to the finger and fingernail not sufficient).   Courts have been advised, however, that even a minor injury can constitute the basis of an excessive force claim.    Wilkins v. Gaddy, 559 U.S. 34, 38, 130 S. Ct. 1175,  175 L. Ed. 2d 995 (2010) (the "core judicial inquiry" in an Eighth Amendment excessive force case is not the extent of the injury but the nature and the intention behind the use of force).   See, *e.g.*, Bowden v. Stokely, 576 Fed. App'x 951, 954 (11th Cir. 2014) (holding that the plaintiff's testimony was that "he was the victim of an unprovoked attack in circumstances that did not present a risk of creating a disturbance or harming staff or other inmates ... could support an excessive force claim despite the lack of serious injuries").

The law as explained in Bell, Whitley, and Hudson was clearly stated years before the conduct at issue in this case.   It must follow, of course, that the law was clearly established in 2012, when the alleged beating occurred.

15

The version of the facts offered by McDonald, if accepted and believed by a factfinder, establishes that the actions of Thomas could be found to fall into the category of conduct the court in <u>Hudson</u> deemed "wanton, arbitrary, or intended to punish."   Accepting the plaintiff's evidence as true, as the court must at this juncture, it is clear that Thomas became angry after McDonald complained loudly about the way the ice was being distributed by Thomas, who was sitting in the air-conditioned office.   Thomas then inflicted injury upon McDonald while McDonald was complying with an order to pack up his belongings and get out of the dorm.   The version of events offered by McDonald and supported by other inmates' testimony (and, largely, by the testimony of Thomas) indicates that McDonald did not pose any threat to inmates or to Thomas, and that there was no need, at the time Thomas struck McDonald over the head with the baton, to restore order or maintain discipline, as there was no threat to the safety of Thomas or other inmates.[9]   The

---

[9]   Thomas's claim that McDonald made a move toward him and that he was "spooked," while suggesting that he perceived some threat, is not substantiated by other facts, including the fact that the inmates stepped in to break up the altercation and stop the beating, but did not attack or harm Thomas in any way.   Moreover, there is no indication that McDonald had been a violent or uncooperative inmate in the past, or had ever made any threats to any corrections officer.   <u>See</u>, <i>e.g.</i>, <u>Campbell v. Sikes</u>, 169 F.3d 1353 (11th Cir. 1999) (finding force not excessive where inmate had repeatedly bitten and scratched officials and threatened to hurt herself and others); <u>Sims v. Mashburn</u>, 25 F.3d 980 (11th Cir. 1994) (finding force not excessive where the inmate had threatened that if officials entered his cell: "I'll buck; you'll have to kill me.").   The level of force used to subdue an inmate may increase where that inmate is a "high-risk, dangerous inmate" or has a history of escape or aggression, but that has not been even suggested in the case of McDonald.   <u>See</u> <u>Scroggins v. Davis</u>, 346 Fed. Appx. 504 (11th Cir. 2009).   In any event, there is

Eleventh Circuit Court of Appeals has stated that, "any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation." Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991).   If McDonald's evidence is believed – that Thomas came after him with the baton while he was obeying the officer's command to pack up his belongings and while there was no threat to any other officer or inmate – then a reasonable and logical conclusion is that Thomas acted maliciously or sadistically, motivated by a desire to punish or inflict harm and not by a desire to maintain order.   While the defendant certainly may dispute McDonald's description of the events, the facts and circumstances alleged in the complaint and supported by the testimony of McDonald and other inmates create a genuine issue of facts whether the defendant maliciously or sadistically inflicted harm on him, and this dispute cannot be resolved on summary judgment.

Looking more closely to the factors that must be weighed, the evidence viewed in the light most favorable to McDonald indicates that there was little if any need for the application of force.   McDonald's evidence shows that he was complying with the officer's orders, even if slowly and begrudgingly.   McDonald

---

a genuine dispute of fact concerning whether McDonald made any movement toward Thomas. McDonald and other witnesses have testified that McDonald had his back to Thomas, packing his belongings, when he was struck.   This seems to be confirmed by the wound suffered on the upper back of McDonald's head.   Because there is a genuine dispute of fact, the court must accept the plaintiff's version that he mead no threatening movement toward Thomas.

made no physical threat toward the officer.   Other inmates were not creating any further disturbance, and some were not even alerted to the verbal altercation until they heard the crack of the baton hitting McDonald in the head.   The initial blow to McDonald's head was forceful enough to cause a gash, and Thomas continued hitting McDonald after he fell back onto the bunk.   An ADOC investigation into the beating concluded that Thomas used force in excess of that required by its own guidelines.

The court also must examine the threat "reasonably perceived" by Thomas. While Thomas states that he was "spooked," and was in fear that things could "get ugly," he also could have waited for backup or could have given McDonald more time to comply with his order.   Other than cursing at McDonald, Thomas did not make other efforts to force compliance or to de-escalate the confrontation.   Finally, McDonald's injuries, while not life threatening, were not so minor as to be deemed "*de minimus*".

Well-established federal law gave any reasonable officer "fair warning" that inflicting injury on an inmate who is posing no threat and is compliant with the officer's orders is illegal.   Accordingly, the defense of qualified immunity does not protect the defendant in this case, and the motion for summary judgment on this ground is due to be denied.

**B. State-Law Claim**

Plaintiff also asserts that the defendant's actions in hitting him with his baton were negligent, reckless, and wanton, in violation of Alabama law.   Defendant asserts that he is entitled to state-agent immunity from this claim.   The plaintiff has responded, arguing that the conduct of Thomas was willful, malicious, or in bad faith, and therefore outside of the protections offered by state-law immunity.

In Ex parte Cranman, 792 So. 2d 392 (Ala. 2000), the Alabama Supreme Court redefined state-agent immunity,[10] stating:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> (1) formulating plans, policies, or designs; or
>
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>
> (a) making administrative adjudications;
>
> (b) allocating resources;

---

[10]   Prior to Cranman, the courts examined whether the state agent was performing duties that could be categorized as "discretionary functions" requiring difficult decisions or choices, or "ministerial acts" that required a lesser degree of judgment.   See, e.g., Smith v. Arnold, 564 So. 2d 873, 876 (Ala. 1990).

(c) negotiating contracts;

(d) hiring, firing, transferring, assigning, or supervising personnel; or

(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or

(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

Cranman, 792 So. 2d at 405.[11]

---

[11]     The plurality decision in Cranman was adopted by the state Supreme Court in Ex

Under Alabama law, a party who raises the defense of state-agent immunity must first bear the burden of demonstrating that the plaintiff's claims arise from a function that entitles him or her to immunity.   Ex parte Wood, 852 So. 2d 705, 709 (Ala. 2002).   Only if the defendant makes that showing does the burden shift to the plaintiff, who can overcome the immunity defense by establishing that the defendant acted willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.   852 So. 2d at 709.

The court finds that Thomas has met this threshold burden.   The complaint alleges that Thomas was exercising his judgment in the discharge of his duties as a prison guard. The burden then shifts to the plaintiff, who argues that Thomas acted "willfully, maliciously, or in bad faith."   The court agrees that the facts, viewed in a light favorable to McDonald (which are all that matter in a summary judgment inquiry) allege behavior that could be categorized as willful or malicious, and therefore meets the plaintiff's burden.   Therefore, for all the same reasons that the defendant is not entitled to summary adjudication on the 1983 claim, the court is persuaded that the protections of state-agent immunity are not available to Thomas.

---

parte Rizk, 791 So. 2d 911 (Ala. 2000) and Ex parte Butts, 775 So. 2d 173 (Ala. 2000).

Plaintiff further opposes the motion for summary judgment by asserting that Thomas acted "beyond his authority" because he failed to follow the ADOC rules and regulations governing the use of force.   It is clear that where a state agent acts in contradiction to specific rules or regulations, he may be found to be "beyond his authority" so as to remove the protection of state-agent immunity.   One method by which a plaintiff may demonstrate that the state agent acted beyond his authority is to offer evidence that the defendant failed to "discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist."   Giambrone v. Douglas, 874 So. 2d 1046, 1052 (Ala. 2003), quoting Ex parte Butts, 775 So. 2d 173, 178 (Ala. 2000).

In this case, where a jury could find that Thomas struck McDonald in a malicious manner, and where Thomas was found by the Alabama Department of Corrections to have failed to adhere to the rules regarding use of force, he is not entitled to state-agent immunity.   Accordingly, the motion for summary judgment on that ground also is due to be denied.

## **CONCLUSION**

Based on the foregoing undisputed facts and legal conclusions, the court finds that the motion for summary judgment filed by the defendant is due to be denied.   A separate order will be entered in accordance with the findings set forth herein.

DATED the 3rd day of March, 2015.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE